# EXHIBIT A

22456381

# Exhibit A

**FILED**

KING COUNTY, WASHINGTON

OCT 30 2012

SUPERIOR COURT CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

MARTA LYALL,

                         Plaintiffs,

    v.

UNIVERSITY OF WASHINGTON,

                         Defendants.

No.  11-2-16291-2 SEA
ORDER OF INJUNCTIVE RELIEF

This matter came before the court on Plaintiff's Amended Complaint for Injunctive Relief. The court has considered the pleadings on file, and considered the argument of the parties. The court finds as follows:

1. On August 24, 2010, an Order for Protection, Anti-Harassment was entered in favor of Marta Lyall, Petitioner, against Noah David Simon, Respondent under cause 10-2-04392-6.

2. On January 28, 2011 Noah David Simon under cause 10-1-10211-2, was sentenced for the crimes of Harassment and Cyberstalking, the victim of both crimes being Marta Lyall.

3. On July 28, 2011 an Order for Protection, Anti-Harassment was entered in favor of Marta Lyall, against Sarah Levine Simon, the mother of Noah David Simon under cause number 11-2-16227-3.

4. In all of the above-referenced orders, the respondents were ordered to have no contact with the petitioner, either directly, or by third parties, nor to engage in other activity directed at respondent as set out in those orders.

ORDER ON INJUNCTIVE RELIEF -1



5. Subsequent to those orders, Noah David Simon and Sarah Levine Simon, and other third parties at the Simons' request (Brian Cuban and Herbert Tichman) have made Public Records requests of the University of Washington for records relating to Marta Lyall. The evidence shows that the Tichman request was fraudulent, as he was deceased, but was acquainted with Sarah Simon.

6. The evidence demonstrates that the Simons are attempting to use the Public Records request process as means to circumvent the prohibitions set out in the Anti-Harassment Orders and Criminal Judgment referenced above.

7. There is no legitimate reason for these requests. Providing records to the Simons, or third parties on their behalf would cause the Simons to violate the Anti-Harrassment and/or Judgement and Sentence Orders.

Now, therefore, the court Orders as follows:

1. The University of Washington is permanently enjoined from providing any records referencing Marta Lyall to Noah David Simon, Sarah Levine Simon,  Brian Cuban, or Herbert Tichman.

2. If any further requests are made for records relating to Marta Lyall, before disclosing any records, the University of Washington shall notify Marta Lyall at least six weeks in advance of release of the records to allow for her to determine whether to seek additional injunctive relief against such disclosure.

3. The University of Washington shall send the notification provided in paragraph 2 above to Marta Lyall at the last physical address, email address, telephone number, fax number, or other means of contact last provided by Marta Lyall.

DONE IN OPEN COURT this _30_ day of _October_ , 2012

_____
JUDGE LAURA C. INVEEN

ORDER ON INJUNCTIVE RELIEF -2

# EXHIBIT B

**EXHIBIT B**



**Carnegie Mellon**

Office of the Provost
Carnegie Mellon University
5000 Forbes Avenue
Pittsburgh, Pennsylvania  15213-3890
412-268-6684
Fax:  412-268-2330

May 31, 1995

Professor Marta Lyall
1521 NW 60th #104
Seattle, WA  98107

Dear Professor  Lyall,

On behalf of the University, I welcome you to the Carnegie Mellon faculty.  I am pleased to invite you to participate in our annual orientation program for incoming faculty members from August 22 to August 24.

This incoming faculty orientation program has several goals: to introduce you to the University and its teaching environment; to enable you to meet both veteran faculty members and key administrators; to help you become acquainted with incoming faculty members from all over the university; and, most important, to introduce you to the expectations which the University has for both teaching and learning.  In addition, I am certain that you will enjoy yourself.

Everyone who has attended the orientation program over the past six years has considered it well worth the time investment.  Indeed, many suggest that the program has been most important toward their getting off to a good start as faculty members here.  Thus, I strongly urge you to attend this year's program.

I look forward to meeting you at orientation and to working with you as a colleague in the years to come.

Sincerely,

Paul Christiano
Provost

Short Video Clip from NBC affiliate, interview with Plaintiff, when Noah Simon, CMU "helper" or frontman, who was later convicted, in 2011 for this behavior. He was associated with Mark Cuban, through his brother and employee Brian Cuban, and Brent Scott.

https://youtu.be/-Xu_kVyoOUY

Below: Brent Scott, faculty at Carnegie Mellon University, who became public figure in 2009. Creating the work with technical means he developed at CMU. And whose work was supported by CMU and the University of Washington.



mary weidner,
Grievance testimony

62

TRANSCRIPT OF PROCEEDINGS - VOLUME I

- - - -

1   hours of discussion, the faculty voted overwhelmingly
2   in favor of a three-year reappointment for Marta
3   Lyall.  Bryan also expressed his support for her.
4   The assigned committee members spent the weekend
5   writing our letter of factual support so that we
6   might -- our letter of faculty support.  When we
7   convened on Wednesday, November 5th, to sign the
8   letter, Bryan dramatically presented us with email
9   evidence which he said was the last straw against
10  Marta and had caused him to withdraw his support.  It
11  involved the name plate incident and subsequent email
12  exchanges which I believe you have read about that
13  has been...

14          The faculty asked to hear Marta's side of the
15  story.  Bryan refused.  When we continued in
16  discussions to support Marta, he said that he felt
17  hung out to dry.  The faculty was so bothered by all
18  of this, that it had happened, that some proceeded to
19  belittle Edith Balas for being upset that her name
20  plate was torn down, and Edith was in the meeting.
21  This, to a Jew who was the survivor of a Nazi
22  concentration camp, belittling her, that her
23  nameplate had been torn down.

C03792

LANA M. BYER & ASSOCIATES COURT REPORTING SERVICE
(412) 263-2544

mary weidner,
Grievance testimony

TRANSCRIPT OF PROCEEDINGS - VOLUME I

- - - -

1   you are invited to continue.

2                   PROFESSOR WEIDNER:   Thank you.

3           So why was I willing to invest my time in

4   preparing for this interview, to risk retribution

5   from my department head and alienation from some of

6   my colleagues?  Because all of these little and big

7   events lead me to believe that a pattern of

8   harassment exists that consciously worked to

9   undermine Professor Lyall so that it was impossible

10  for her to excel and do the work that she was hired

11  to do.

12          There is an old boys network at work here,

13  resulting in the hiring of friends by friends.  This

14  historically has been one the most effective ways in

15  which qualified minorities and women have been kept

16  outside the system.

17          Thank you.

18                  PROFESSOR OPPENHEIM:  Thank you very,

19  very much.  The Committee has conferred and does wish

20  to ask further questions of Professor Weidner, and

21  would wish to do so in private.          C03802

22          I might invite you and your next witness to

23  wait in the lounge.  If the questioning is lengthy,

LANA M. BYER & ASSOCIATES COURT REPORTING SERVICE
(412) 263-2544

325a

Edith Balas
Deposition                                                                12

1   A.   Mary Schmidt is a lecturer, I believe.  Her position

2        is a lecturer.  She is administrator, and right hand

3        of Rogers.  And Rogers wanted her to be part of the

4        faculty.

5   Q.   Does Dr. Rogers tolerate dissent well?  Does he

6        tolerate dissent?

7   A.   No.

8   Q.   How does he, in your experience, how did he react

9        when he was confronted with dissent or protest over

10       his decisions?

11  A.   Usually those people who dissent, they had to suffer

12       for it, the consequences of the dissent.  I mean I'm

13       talking about myself.

14  Q.   How were you made to suffer for dissent, Professor?

15  A.   Well, I was never appreciated.  When I asked for

16       money to go to New York, for instance, to give a

17       paper, I was not given money.  I was not given

18       graduate student helper when every one of the

19       faculty had one.  And I just didn't understand why I

20       didn't have one.

21  Q.   Did you believe these things were happening to you

22       in retaliation for your dissent and opposition of

23       Dr. Rogers?

24  A.   Yes.

13

| | | |
|---|---|---|
| 1 | Q. | Had you ever seen him engage in that type of |
| 2 | | activity with other professors who you work with, |
| 3 | | and that means retaliating against them for dissent |
| 4 | | or opposition? |
| 5 | A. | Yes. |
| 6 | Q. | And can you recall who? |
| 7 | A. | Well, of course it's the case of Marta Lyall, first |
| 8 | | of all.  And I know that friends of mine, like Mary |
| 9 | | Weidner, complained to me several times that he |
| 10 | | shouted to her, he shouted to me, too, in front of a |
| 11 | | secretary, in front of other people. |
| 12 | Q. | With the exception of Dr. Rogers, have you ever been |
| 13 | | shouted at by a Head of a School of Art in front of |
| 14 | | secretaries? |
| 15 | A. | No. |
| 16 | Q. | Did you find that to be rather unfriendly behavior |
| 17 | | on his part? |
| 18 | A. | Yes. |
| 19 | Q. | What was your perception of Professor Lyall as a |
| 20 | | teacher? |
| 21 | A. | I was never in her class.  I don't know.  I know of |
| 22 | | her when we hired her, she gave a lecture, and she |
| 23 | | was -- she seemed to me very intelligent, very |
| 24 | | articulate.  And she was the best of the lot we have |

edith balas deposition

15

| 1 | | time ago. |
|---|---|---|
| 2 | Q. | The best you can recall today, what was Professor |
| 3 | | Sturgeon complaining about vis-a-vis Marta? |
| 4 | A. | I cannot say. It was a long and involved complaint |
| 5 | | about which I didn't understand much. I just had |
| 6 | | this global feeling that he was complaining, |
| 7 | | complaining and complaining. |
| 8 | Q. | Did any of the other professors or attendees at that |
| 9 | | meeting join in his complaints and confirm what he |
| 10 | | was complaining about? |
| 11 | A. | No, I don't remember that. |
| 12 | Q. | Do you remember whether any of your colleagues were |
| 13 | | surprised to hear about these complaints, given |
| 14 | | their experience with Professor Lyall? |
| 15 | A. | I don't know that. I, myself, was surprised. |
| 16 | Q. | Do you recall -- we've had testimony from other |
| 17 | | witnesses about that, and I think it was an April of |
| 18 | | 1997 meeting, do you recall the faculty appointing a |
| 19 | | Professor Maier and Professor Olds to go talk to |
| 20 | | Marta Lyall about the complaints that Professor |
| 21 | | Sturgeon was bringing? |
| 22 | A. | Yes. That's so, yes. |
| 23 | Q. | And did you later learn from Professors Maier and |
| 24 | | Olds what Marta had told them? |

Erie, PA
(814) 453-5700

$3\lambda\alpha$ **AKF**

Pittsburgh, PA
(412) 261-2323

1   A.   Yes.

2   Q.   And Marta's reaction to it, and then Dr. Rogers'

3        reaction to Marta's reaction.

4   A.   Yes.

5              MR. DeFOREST:   Objection to the form of

6        the question, it hasn't been established there was

7        vandalizing.

8   BY MR. McHUGH:

9   Q.   There's been some suggestion that the ink, or not

10       the ink, or the glue didn't hold.   What do you

11       recall -- first of all, could you describe for me

12       prior to the time --

13  A.   I tried to describe the vandalizing issue.

14  Q.   Describe for me where the nameplate was.   Was it on

15       the door, was it on the wall next to your door?

16  A.   The name tag is this big.   How many inch would be?

17             MS. HOOKER:   3 x 6?

18  BY MR. McHUGH:

19  Q.   Looks like 3 x 6.

20  A.   And it is embedded into the wall near my door, as it

21       is today.   You can -- one can see.   And it was

22       vandalized.   It was taken out of the wall one night,

23       one day, when I was at the University.   I don't

24       remember the day, but then --

edith balas deposition

1   Q.   Did it look like it had been pried off?

2   A.   Vandalized.

3   Q.   Vandalized meaning taken off?

4   A.   Taken off forcefully.

5   Q.   Had that ever happened in the past, up to that point

6       in time, had you ever had your --

7   A.   Not to me.

8   Q.   Prior to this incident of the vandalizing of your

9       nameplate, had you participated in a meeting of

10      faculty at which you spoke against the appointment

11      of Steven Kurtz, or the offering of a new contract

12      of Steven Kurtz?

13   A.   Yes.  I would have not remembered now, but now I

14      know that, yes.

15   Q.   About how long before the incident with your

16      nameplate was that meeting that you spoke against

17      Professor Kurtz?

18   A.   Not long before, but I don't know the dates.

19   Q.   What was the nature of your objection to the

20      reappointment of Professor Kurtz?

21   A.   He is an anarchist, who wanted and wants maybe even

22      today to blow up the university computing system.

23      And he has this type of revolutionary writings and

24      revolutionary art.  So I did not want him to be

edith balas deposition

20

| | | |
|---|---|---|
| 1 | | reappointed. |
| 2 | Q. | Was Dr. Rogers at the meeting where you expressed |
| 3 | | those opinions? |
| 4 | A. | Yes. |
| 5 | Q. | How did he react to your expressing those opinions, |
| 6 | | if you can recall? |
| 7 | A. | I don't remember. |
| 8 | Q. | Let's go back to the day your door was vandalized |
| 9 | | again. How long after you saw the vandalization, |
| 10 | | what you believe to be vandalization, did you run |
| 11 | | into or come into contact with Marta? |
| 12 | A. | Must have been -- I usually had my classes noontime |
| 13 | | or before noon. And I run into Marta about 4:00 in |
| 14 | | the afternoon, or 5:00, something like this, a few |
| 15 | | hours had passed. |
| 16 | Q. | And where did you run into her? |
| 17 | A. | I run into her in the basement of the building. |
| 18 | Q. | And how far was that from your office? |
| 19 | A. | Well, I am on the third floor, so three floors down, |
| 20 | | in the basement of the building. |
| 21 | Q. | Did you tell her what happened when you ran into |
| 22 | | her? |
| 23 | A. | Yes, I told her. |
| 24 | Q. | Were you upset about what happened? |

edith balas deposition

```
 1    A.    I was very upset, yes.

 2    Q.    And did you express that to Marta?

 3    A.    I expressed that to Marta.

 4    Q.    And the best you can recall today, what did you tell

 5          her happened?

 6    A.    I told her that this happened to me, my door was

 7          vandalized.  Could be that I spoke against a person,

 8          and he instigated some students to do that to me.

 9    Q.    Did you tell her who that person was?

10    A.    No.

11    Q.    Now Professor Kurtz, he wasn't shy about his

12          anarchist views, he was pretty open about it?

13                MR. DeFOREST:  Objection to the form of

14          the question.  That's obviously a leading question.

15    BY MR. McHUGH:

16    Q.    Did Professor Kurtz express these opinions openly to

17          the other faculty, these anarchist views?

18    A.    Yes.  He has his views in writing.  And I learned

19          about his views in writings, because I was one of

20          the members of the DRC Committee, Departmental

21          Reappointment Committee.  And I renounced, because I

22          thought it is not proper that I should be in the

23          committee if I am against someone.

24    Q.    Prior to this point in time, did you ever learn or
```

Erie, PA
(814) 453-5700

AKF

Pittsburgh, PA
(412) 261-2323

Edith balas deposition

DLC  Document 4-1  Filed 07/29/22  Page 16 of 66

29

| 1 | A. | No, I don't know.  He could have. |
|---|---|---|
| 2 | Q. | Did any of your fellow teachers come and take a look |
| 3 | | at this? |
| 4 | A. | I don't know whether they did, because the next |
| 5 | | morning, was repaired. |
| 6 | Q. | Have you ever, during any academic meetings, have |
| 7 | | you ever observed Professor Kurtz shouting and |
| 8 | | screaming and hollering at Elaine King when they |
| 9 | | have had a dispute? |
| 10 | A. | Yes. |
| 11 | Q. | Did that happen more than once? |
| 12 | A. | I remember only once. |
| 13 | Q. | Had you ever experienced any similar behavior |
| 14 | | from -- |
| 15 | A. | No. |
| 16 | Q. | At the time Professor Kurtz was exhibiting this |
| 17 | | behavior, did anybody admonish him or tell him to |
| 18 | | stop? |
| 19 | A. | Maybe Marta did. |
| 20 | Q. | Maybe who? |
| 21 | A. | Marta. |
| 22 | Q. | Do you know whether Dr. Regers was at that meeting? |
| 23 | A. | No.  Partly.  Partly.  Then he left when this |
| 24 | | occurred, the shouting occurred. |

# EXHIBIT C

**Exhibit C**

## AGREEMENT AND GENERAL RELEASE

Carnegie Mellon University (hereinafter "Carnegie Mellon") and Marta Lyall ("Lyall"), in exchange for their mutual promises herein set forth, hereby agree as follows:

1.   It is understood and mutually agreed that this Agreement and General Release is entered into as a settlement of claims that have been or might be asserted by Lyall and that are disputed and disavowed by Carnegie Mellon, and that by entering into this Agreement and General Release the parties intend to amicably resolve their differences. The parties have entered this Agreement and General Release in order to avoid continued litigation, and it shall not be construed as an admission of any violation of any laws or rights by any parties.

2.   Carnegie Mellon will pay a total of *one hundred and twenty five thousand* Dollars ($ *125,000* ), as is more fully allocated below:

    (a)  Carnegie Mellon will pay in connection with Lyall's discrimination claim, ($ *35,687.00* ) *thirty five thousand six hundred and eighty seven* Dollars, which will be subject to tax withholding. Federal income tax shall be withheld at the lowest rate permissible under law.

    (b)  Carnegie Mellon also will pay, in connection with Lyall's workers' compensation and/or short term disability and/or long term disability claims, the total amount of (one-half of the net amount of the settlement) *thirty five thousand six hundred and eighty seven* Dollars ($ *35,687* ).

    (c)  Carnegie Mellon agrees to reimburse Lyall for expenses by payment of ($ *53,626.00* ) *fifty three thousand six hundred and twenty six* Dollars to Patrick M. McHugh, Esquire in payment of expenses and fees;

Said payment is not to be construed as an admission by either party that Lyall was entitled to or not entitled to workers' compensation, short term disability, long term disability or any other amounts. Any taxes owed on these payments are the sole responsibility of Lyall.

Lyall agrees to execute a Compromise and Release Agreement, waiving workers' compensation, workers' compensation indemnity and workers' compensation medical benefits, and will attend a hearing, as necessary, before a workers' compensation judge to approve the Compromise and Release Agreement.

Said payments under this paragraph will be paid by Carnegie Mellon by checks made payable to Marta Lyall and Patrick M. McHugh, Esquire within five working days of a filing by Lyall, dismissing with prejudice of <u>Lyall v. Carnegie Mellon University</u>,

C:\wpdocs\doc2898

at Civil Action No. 98-1516 in the U.S. District Court for the Western District of Pennsylvania.

In the event Carnegie Mellon fails to make the payments within the time period required, it hereby agrees that Carnegie Mellon shall pay a penalty of 1% of the total amount due for each full seven (7) day period for which said payments are late.

3.    It is understood that Lyall will not seek COBRA (benefit continuation coverage), and Lyall agrees that she is deemed to have resigned under circumstances that do not constitute a "qualifying event" under COBRA.  It is understood and agreed that Lyall will not apply for employment at Carnegie Mellon or its subsidiaries and that she will not be employed by Carnegie Mellon or its subsidiaries in the future.

4.    The terms of this Agreement and General Release shall be kept confidential by the parties and may be disclosed only to their attorneys, their accountants and Lyall's spouse, and then only under an agreement that said persons keep such terms confidential and not disclose them to any other person or entity. The parties may say that the matter has been settled.

5.    Lyall and CMU hereby agree to incorporate by reference and expand the confidentiality agreement signed between the parties on or about December 29, 1998, and issued as an order by the judge in this case.  In addition to any document explicitly covered by the provisions of said agreement, the parties agree that Lyall's diaries, e-mail, psychological evaluations and treatment records, are deemed confidential and will be returned to Lyall under the terms of the confidentiality agreement.

6.    Lyall, for herself and for her heirs, executors, administrators, successors, assigns and other personal representatives, irrevocably and unconditionally remises, releases, settles, compromises and forever discharges any and all manner of suits, actions, causes of action, damages and claims, known and unknown, that they have or may have against Carnegie Mellon and/or any of the past or present officers, trustees, administrators, attorneys, agents, employees and students of Carnegie Mellon and/or any pension or benefit plans of Carnegie Mellon or any of its successors and/or the past or present officers, trustees, administrators, fiduciaries, agents and employees of the pension or benefit plans of Carnegie Mellon or its successors, for any actions up to and including the date hereof and the continuing effects thereof.  This Release includes, but is not limited to, claims for attorneys' fees, expenses and/or costs.  This Release also includes, but is not limited to, any Carnegie Mellon benefit plans, any and all rights under COBRA and claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act, the Pennsylvania Workers' Compensation Act and any

other federal, state or local statutes, ordinances, executive orders or regulations, and state or local law claims.  Lyall is not hereby waiving or releasing any presently vested claims or rights she may have to her ultimate receipt of funds currently in her retirement/pension account under the Faculty and Staff Retirement Plan (however, this settlement does not increase said rights or the amount of said funds).

7.    Carnegie Mellon irrevocably and unconditionally remises, releases, settles, compromises and forever discharges any and all manner of suits, actions, causes of action, damages and claims, known and unknown, that it has or may have against Marta Lyall for any actions up to and including the date hereof and the continuing effects thereof.

8.    Lyall hereby consents to dismissal and termination with prejudice of any and all claims released herein, which have been or may be filed with any court or agency, including <u>Lyall v. Carnegie Mellon University</u>, at Civil Action No. 98-1516 in the U.S. District Court for the Western District of Pennsylvania. Lyall also agrees to enter into the Compromise and Release Agreement before a workers' compensation judge as referenced in paragraph 2 of this Agreement and General Release.  Lyall also agrees not to assert any claims under the Carnegie Mellon Short-term or Long-term Disability Plans.

9.    There are no understandings between the parties other than as set forth in this Agreement and General Release and there have been no promises, inducements or commitments made in conjunction with this Agreement and General Release which are not explicitly set forth herein.  Carnegie Mellon will not make any payments to or on behalf of Lyall other than those specified in paragraph 2 above.

10.    The undersigned intend to be legally bound by this Agreement and General Release and affirm that they have been given at least twenty-one days to consider this Agreement and General Release, which the parties acknowledge is a reasonable period of time, that they have carefully read it, that they have had it explained to them by their respective counsel, and that they have signed, sealed and delivered it voluntarily, and without

C:\wpdocs\doc2898                                    3

coercion and with knowledge of the nature and consequences
thereof.

_____  9/05/00        Martin Putro    30 August 2000
Marta Lyall              Date            Carnegie Mellon University   Date

_____                 _____
Patrick M. McHugh, Esquire              Walter P. De Forest
Attorney for Plaintiff                  General Counsel
                                        Carnegie Mellon University
                                        Attorney for Defendant


STATE OF WASHINGTON      )
                         )      ss:
COUNTY OF                )

        On this  5  day of  Sep, 2000, before me, the undersigned
officers, personally appeared Marta Lyall, known to me (or
satisfactorily proven) to be the person whose name is subscribed
to the above instrument, and acknowledge that she executed the
same as her free act and deed.  IN WITNESS WHEREOF, I have
hereunto set my had and official seal.


┌─────────────────────────┐
│  BARBARA M. DITTMAN      │        Barbara M Dittman
│  NOTARY PUBLIC           │        Notary Public
│  STATE OF WASHINGTON     │        My Commission Expires  May 15, 2002
│  COMMISSION EXPIRES      │
│     MAY 15, 2002         │
└─────────────────────────┘


COMMONWEALTH OF PENNSYLVANIA  )
                              )      ss:
COUNTY OF ALLEGHENY           )

        On this _____ day of _____, 2000, before me, the undersigned
officers, personally appeared _____, known to me
(or satisfactorily proven) to be the person whose name is
subscribed to the above instrument, and acknowledge that she
executed the same as her free act and deed.  IN WITNESS WHEREOF,
I have hereunto set my had and official seal.


                                 _____
                                 Notary Public
                                 My Commission Expires


C:\wpdocs\doc2898                        4

# EXHIBIT D

**Exhibit D**



**Image sent to Plaintiff in 2009-2012, by CMU party, who was later convicted. (See Exhibit A, for ref to criminal case number.)**



Edit

Image posted by Project Catalyst/Cardano representative, who was identified by IOHK, IOG, and Cardano, to represent women. This image appeared in April, 2022, after the Plaintiff was under attack by those related to Defendant Carnegie Mellon. This was just after Carnegie Mellon had named a School after the founder of Cardano, Charles Hoskinson. And after Mark Cuban had begun engaging with Hoskinson.
Note the poster, is former Military, (she describes below with photos of herself). This was similar with other efforts at Carnegie Mellon, who were directed to belittle women.





11:16 AM  Fri Jul 29



Tweets    Tweets & replies    Media    Likes

#crosschainbabe #Crosschain



Search Twitter

## What's happening

Video games · LIVE
**Gamers celebrate the release of Digimon Survive**
Trending with #DigimonSurvive



**#DCSuperPets🐾**
Get Tickets Now
Promoted by DC League of Super-Pets

Trending in United States
**Shakira**
35.4K Tweets

Politics · Trending
**Electoral College**
7,507 Tweets

War in Ukraine · Yesterday
**Latest updates on the war in Ukraine**



Show more

**This is an image of Ally, of Cardano women. Note the similarities to that of Brent Scott's work during and after Carnegie Mellon.**



1:06



0:08    AY, IT'S THE PLAYOFFS.

1.1M views

💬 24    🔁 81    ♡ 633    ⬆

↗ Promoted



**$Kiwi-Crypto** @CaspersOnIt454 · 6m

Shouldn't laugh, but the picture... omfg ....

 **axehole** @axehole42 · 39m

Replying to @IOHK_Charles

This is a posting that appeared in the Plaintiff's Twitter feed, after she had been involved with technical leaders in Silicon Valley, who were not heterosexual. This also is a common expression of those who have been in the military.



💬    🔁    ♡ 1    ⬆

**You might like**

 **Jєnniε D** @ergomergoadargo · 2h

I have my health. My loved ones do to
Spring. Strawberries are in season. They're

Case 9:22-cv-00123-DLC   Document 24   Filed 07/29/22   Page 28 of 66




**Tweets**    Tweets & replies    Media    Likes

 **AllyIllustrated |$allyillustrated {ALWAYS MINTING}** @allyillu... · 6d   •••
GM
•
11 years ago today I enlisted in the USAF & went to BMT -
Today I'm a #web3women + vet
.
Why?
My stepfather convinced me- I wasn't going to do too well in life as I
wasn't the best at school & I wanted to travel (getaway from home)





Q Search Twitter    ⚙

## What's happening

**Video games** · LIVE
**Gamers celebrate the release
of Digimon Survive**
Trending with #DigimonSurvive



**#DCSuperPets** 🐾
Get Tickets Now
↗ Promoted by DC League of Super-Pets



Trending in United States   •••
**Shakira**
35.4K Tweets

**Politics** · Trending   •••
**Electoral College**
7,507 Tweets

**War in Ukraine** · Yesterday
**Latest updates on the war
in Ukraine**



Show more   ›



# EXHIBIT E

EXHIBIT E



TheLostLadiesLittleRed14

Fwltur's Fables

---

**Trending**

## What's happening

News · LIVE

### Amber Heard resumes testifying in Johnny Depp defamation trial

Trending with #JohnnyDeppvAmberHeard,



Trending in United States

### Great Replacement Theory

The mass shooting in a predominantly Black neighborhood of Buffalo on Saturday has renewed scrutiny of media figures and politicians who have pushed the Great Replacement Theory, which the suspect allegedly wrote about in a 180-page document

Trending with Elise Stefanik

Entertainment · Trending

### #AmberHeardDeservesPrison

2,292 Tweets

COVID-19 · LIVE

### COVID-19: News and updates for Washington

War in Ukraine · LIVE

### Ukrainian troops defending Kharkiv have reached the border with Russia, governor says





SMAUG
CARDANO STAKE POOL

# LittleRed37

asset14psznn4ctewsaheunys2674nn0r0haaqthujzu



TheLostLadiesLittleRed37

Fwltur's Fables

Artist
Fwltur

Series
The Lost Ladies

Threefoldbold
threefoldbold.io



note: this is the blue dog, belonging to The plaintiff. Which looks like a wolf. And was wounded in Oct 2021-November 2021, in exactly the same spot as image shows. During the CMU 2009-2012 effort to harm the Plaintiff by CMU, after Brent Scott became a public figure, the Plaintiff received an email threatening the death of her dog. So this is not new.



← ···

**Follow**

**Fwltur**
@Fwltur

**This is account which created image.**

Multiverse traveller searching for Lost Nomads

⊙ gate 0.90 (Bodega)   🔗 threefoldbold.io   🗓 Joined October 2021

**146** Following   **211** Followers

 Followed by cookthyme, Cadambabo CAOW Stake Pool, Cardano Bruce, and 8 others

**Tweets**          Tweets & replies          Media          Likes

**Note: Twitter account created same date as Plaintiff's project was funded. And Name of account similar to name Plaintiff used to Identify herself, which is the Scottish name for LYALL, which means wolf.**

📌 **Pinned Tweet**

**Fwltur** @Fwltur · 4/25/22                              ···
//:outgoing_signal<PARAblu>
:Signal_secure<Hex32>mask
:Location: NomadsHive

"Greetings Nomads we will have a little pop up auction in the bodega tomorrow. 22:00 BST

10 editions @75 Ada each
These are whispers Nomads echoes from the fold.
Safe Link will be via PARAblu."

#CNFT

💬 6          🔁 3          ♡ 21          ⬆



# Contact & About

**This is the Plaintiff's contact information. Notice similarity of name to name used to create dog image.**









**Bio**

I am **n+Fold.** My work is based on Open laboratory processes involving the arts, humanities, engineering, and the sciences. My experience includes serving on the faculty of several universities and working with those from computer science, robotics, material science, comparative history of ideas, (in science), economics, mathematics and genetics.

# EXHIBIT F

**Exhibit F**

P.O. Box 23159
San Diego, CA 92193-3159



IMPORTANT INFORMATION
ENCLOSED

71 96900 2484 0701 8603 5

*Received 6/17/2022   Letter Dated 6/10/22*

**Mailed On:** 6/13/2022
**ClientID:** Zieve000336 ER

Cover letter of wrongful
Notice of Default, by
Defendant Rushmore.

**Order Number:** 0156478-01
**Reference Number:** 22-62770

MARTA D LYALL AKA MARTA LYALL
1001 NW 175TH ST
SHORELINE, WA 98177-3809

## Claim Number 26

### Bank of America NA

| Date | Code | Description | | Ref | Amount |
|------|------|-------------|---|-----|--------|
| Nov 15, 2013 | PCCP | Prew rite Cont Debt-Principal only | | 3198665 | 6,659.92 |
| Nov 27, 2013 | PCR | System Check to Creditor Principal | | 3199245 | 1,664.98 |
| Dec 31, 2013 | PCR | System Check to Creditor Principal | | 3202223 | 1,664.98 |
| Jan 31, 2014 | PCR | System Check to Creditor Principal | | 3205543 | 1,664.98 |
| Feb 28, 2014 | PCR | System Check to Creditor Principal | | 3208723 | 1,575.94 |
| **TOTAL FOR Bank of America NA** | | | | | **13,230.80** |

### Rushmore Loan Management Services — Claim Number 26

| Date | Code | Description | | Ref | Amount |
|------|------|-------------|---|-----|--------|
| Mar 28, 2014 | RCP1 | Cred Refund/Rebate - Cont Debt | | | -1,664.98 |
| Mar 31, 2014 | PCR | System Check to Creditor Principal | | 3213587 | 3,240.92 |
| May 30, 2014 | PCR | System Check to Creditor Principal | | 3220111 | 2,825.12 |
| Jun 30, 2014 | PCR | System Check to Creditor Principal | | 3223250 | 1,902.70 |
| Sep 30, 2014 | PCR | System Check to Creditor Principal | | 3232352 | 2,825.12 |
| Dec 31, 2014 | PCR | System Check to Creditor Principal | | 3242108 | 2,829.56 |
| Jan 30, 2015 | PCR | System Check to Creditor Principal | | 3245231 | 2,829.56 |
| **TOTAL FOR Rushmore Loan Management Services** | | | | | **14,788.00** |

> **Note Payments allegedly made to Bank of America for Mortgage. Note when Rushmore took over, they doubled the payment amount, which is not allowed in a 1 month or 1 year period. Note these are both Claim 26, the Plaintiff's Mortgage for her residence. In 2015, Rushmore attorneys claimed the monthly payment was 1600. Per month, in court.**

4

## PAYMENT INFORMATION

| From | Through | Number of Payments | Payment Amount | Total Amount Due |
|------|---------|--------------------|----------------|------------------|
| 5/1/2013 | 2/28/2014 | 10 | $1,113.00 | $11,130.00 |
| 3/1/2014 | 2/29/2016 | 24 | $1,023.96 | $24,575.04 |
| 3/1/2016 | 2/28/2017 | 12 | $1,202.04 | $14,424.48 |
| 3/1/2017 | 2/28/2018 | 12 | $1,424.64 | $17,095.68 |
| 3/1/2018 | 2/28/2019 | 12 | $2,646.57 | $31,758.84 |
| 3/1/2019 | 2/29/2020 | 12 | $2,898.56 | $34,782.72 |
| 3/1/2020 | 2/28/2021 | 12 | $2,657.14 | $31,885.68 |
| 3/1/2021 | 2/28/2022 | 12 | $2,344.70 | $28,136.40 |
| 3/1/2022 | 6/24/2022 | 4 | $2,366.65 | $9,466.60 |

**Note: This is the current claim from Rushmore, dated 6/03/2022, 6/10/22, 6/17/2022, in their alleged Notice of Default. Note they do not acknowledge receiving any payments from the confirmed 2013 Ch 13 case. And they doubled the payment amount to make it impossible to pay, causing the case to fail. They did not want the case to succeed.**

## LATE CHARGE INFORMATION

| From | Through | Total Late Charges |
|------|---------|--------------------|
| 5/1/2013 | 6/24/2022 | $7,148.82 |

## PROMISSORY NOTE INFORMATION

| | |
|---|---|
| Note Dated: | 1/2/2008 |
| Note Amount: | $427,500.00 |
| Interest Paid To: | 4/1/2013 |
| Next Due Date: | 5/1/2013 |

# EXHIBIT G

## Bank of America NA — **Claim Number 26**

| Date | Code | Description | | Check | Amount |
|------|------|-------------|---|-------|-------:|
| Nov 15, 2013 | PCCP | Prew rite Cont Debt-Principal only | | 3198665 | 6,659.92 |
| Nov 27, 2013 | PCR | System Check to Creditor Principal | | 3199245 | 1,664.98 |
| Dec 31, 2013 | PCR | System Check to Creditor Principal | | 3202223 | 1,664.98 |
| Jan 31, 2014 | PCR | System Check to Creditor Principal | | 3205543 | 1,664.98 |
| Feb 28, 2014 | PCR | System Check to Creditor Principal | | 3208723 | 1,575.94 |
| **TOTAL FOR Bank of America NA** | | | | | **13,230.80** |

**Both Bank of America and Rushmore are Creditor 26, so they represent the same Debt, in the Plaintiffs Ch 13 Bankruptcy. Rushmore came on as Servicer, in 2014. And they illegally doubled the Plaintiff's mortgage payment, in order to cause her confirmed case to fail.**

## Rushmore Loan Management Services — **Claim Number 26**

**EXHIBIT G**

| Date | Code | Description | Check | Amount |
|------|------|-------------|-------|-------:|
| Mar 28, 2014 | RCP1 | Cred Refund/Rebate - Cont Debt | | -1,664.98 |
| Mar 31, 2014 | PCR | System Check to Creditor Principal | 3213587 | 3,240.92 |
| May 30, 2014 | PCR | System Check to Creditor Principal | 3220111 | 2,825.12 |
| Jun 30, 2014 | PCR | System Check to Creditor Principal | 3223250 | 1,902.70 |
| Sep 30, 2014 | PCR | System Check to Creditor Principal | 3232352 | 2,825.12 |
| Dec 31, 2014 | PCR | System Check to Creditor Principal | 3242108 | 2,829.56 |
| Jan 30, 2015 | PCR | System Check to Creditor Principal | 3245231 | 2,829.56 |
| **TOTAL FOR Rushmore Loan Management Services** | | | | **14,788.00** |

# EXHIBIT H

**Exhibit H**

Return Address
HOMESTREET BANK
2000 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WA 98101-2326



2000092800120 9
CHICAGO TITLE DT
PAGE 001 OF 012
09/28/2000 13:23
KING COUNTY, WA

—————————— [Space Above This Line For Recording Data] ——————————

MIN: 100047200001975027

# DEED OF TRUST

CHICAGO TITLE INS. CO.
REF# 581903-4

Grantor(s)

 (1) MARTA D LYALL
 (2) JOSHUA E WEST
 (3)
 (4)
 (5)
 (6)

Grantee(s)

 (1) HOMESTREET BANK, A WASHINGTON STATE CHARTERED SAVINGS BANK

 (2) CHICAGO TITLE INSURANCE COMPANY, A MISSOURI CORPORATION

Legal Description (abbreviated)  LOT 27, BLOCK 29, VOLUME 46, OF PLATS, PAGE 42

additional legal(s) on page 2

Assessor's Tax Parcel ID # 358650-0675-09

 THIS DEED OF TRUST ("Security Instrument") is made on September 26, 2000
The grantor is MARTA D LYALL and JOSHUA E WEST, WIFE AND HUSBAND

("Borrower")  The trustee is
CHICAGO TITLE INSURANCE COMPANY, A MISSOURI CORPORATION

("Trustee")  The beneficiary is
Mortgage Electronic Registration Systems, Inc ("MERS") (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns)  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P O Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS
HOMESTREET BANK, A WASHINGTON STATE CHARTERED SAVINGS BANK

("Lender") is organized and existing
under the laws of WASHINGTON
and has an address of 2000 Two Union Square, 601 Union St, Seattle, Washington 98101-2326

**WASHINGTON** - Single Family - **Fannie Mae/Freddie Mac Uniform Instrument** - MERS 197502-D **Form 3048 9/90**
 GREATLAND ■
ITEM 2709L1 (9809) MFWA3114 *(Page 1 of 10 pages)* To Order Call 1 800 530 9393□ Fax 616 791 1131

Borrower owes Lender the principal sum of Two Hundred Forty Six Thousand One Hundred Fifty and no/100                                                    Dollars (U S $ 246,150 00                )
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on October 01, 2030          This Security Instrument secures to Lender (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note, (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument, and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in KING

County, Washington
LOT 27, BLOCK 29, INNIS ARDEN NO 3, ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 46 OF PLATS, PAGE(S) 42 THROUGH 45, INCLUSIVE, IN KING COUNTY, WASHINGTON

which has the address of 1001 NW 175TH STREET
                                                                    [Street]

          SHORELINE                    Washington            98177          ("Property Address"),
          [City]                                              [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property  All replacements and additions shall also be covered by this Security Instrument  All of the foregoing is referred to in this Security Instrument as the "Property "  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.
     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record
     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property
     UNIFORM COVENANTS  Borrower and Lender covenant and agree as follows
     1.   **Payment of Principal and Interest; Prepayment and Late Charges.**  Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note

Unofficial...

2000 092 8001205

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property, (b) yearly leasehold payments or ground rents on the Property, if any, (c) yearly hazard or property insurance premiums, (d) yearly flood insurance premiums, if any, (e) yearly mortgage insurance premiums, if any, and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums These items are called "Escrow Items " Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U S C § 2601*et seq* ("RESPA"), unless another law that applies to the Funds sets a lesser amount If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank Lender shall apply the Funds to pay the Escrow Items Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made The Funds are pledged as additional security for all sums secured by this Security Instrument

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied first, to any prepayment charges due under the Note, second, to amounts payable under paragraph 2, third, to interest due, fourth, to principal due, and last, to any late charges due under the Note

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance This insurance shall be maintained in the amounts and for the periods that Lender requires  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause  Lender shall have the right to hold the policies and renewals  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices  In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender  Lender may make proof of loss if not made promptly by Borrower

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower  If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds  Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due  The 30-day period will begin when the notice is given

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments  If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property  Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest  Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced

2000 092 8001205

by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing

    **7.    Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs Although Lender may take action under this paragraph 7, Lender does not have to do so

    Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment

    **8.    Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law

    **9.    Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection

    **10.    Condemnation** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender

    In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking Any balance shall be paid to Borrower In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments

**11.   Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest  Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest  Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy

**12.   Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17  Borrower's covenants and agreements shall be joint and several  Any Borrower who co-signs this Security Instrument but does not execute the Note  (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent

**13.   Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note

**14.   Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method  The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender  Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower  Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph

**15.   Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located  In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision  To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16.   Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument

**17.   Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require

2000 092 8001205

immediate payment in full of all sums secured by this Security Instrument  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument

If Lender exercises this option, Lender shall give Borrower notice of acceleration  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

**18.  Borrower's Right to Reinstate.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of  (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument, or (b) entry of a judgment enforcing this Security Instrument  Those conditions are that Borrower  (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements, (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged  Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred  However, this right to reinstate shall not apply in the case of acceleration under paragraph 17

**19.  Sale of Note; Change of Loan Servicer.**  The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower  A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument  There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note  If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law  The notice will state the name and address of the new Loan Servicer and the address to which payments should be made  The notice will also contain any other information required by applicable law

**20.  Hazardous Substances.**  Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property  Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge  If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances  gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials  As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection

NON-UNIFORM COVENANTS Borrower and Lender further covenant and agree as follows

21. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by applicable law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as applicable law may require. After the time required by applicable law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by applicable law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.**

22. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it Such person or persons shall pay any recordation costs Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under applicable law

23. **Substitute Trustee.** In accordance with applicable law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law

24. **Use of Property.** The Property is not used principally for agricultural or farming purposes

2000 032 8001205

197502-D  **Form 3048 9/90**
GREATLAND ■
To Order Call 1 800 530 9393☐Fax 616 791 1131

**25.   Riders to this Security Instrument.**  If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument   [Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☒ Other(s) [specify] MORTGAGE INSURANCE | | |

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 10 of this Security Instrument and in any rider(s) executed by Borrower and recorded with it

_____ (Seal)
MARTA D LYALL                         -Borrower

_____ (Seal)
JOSHUA E WEST                         -Borrower

_____ (Seal)
                                      -Borrower

_____ (Seal)
                                      -Borrower

_____ (Seal)
                                      -Borrower

_____ (Seal)
                                      -Borrower

Witness

_____

Witness

_____

2000 092 8001205

Unofficial Copy

ITEM 2709L9 (9809)    MFWA3114          *(Page 9 of 10 pages)*          197502-D   **Form 3048  9/90**
                                                                        GREATLAND ■
                                                     To Order Call  1 800 530 9393 ☐ Fax 616-791 1131

STATE OF WASHINGTON,         KING            County ss

On this day personally appeared before me

    Marta D. Lyall and Joshua E. West

                                    , to me known to be the individual(s)
described in and who executed the within and foregoing instrument, and acknowledged that he (she or they)
signed the same as his (her or their) free and voluntary act and deed, for the uses and purposes therein
mentioned

Given under my hand and official seal this      26th day of    September, 2000



*Arlene E Kozala*

ARLENE E. KAZALA
Notary Public in and for the State of Washington residing at
REDMOND
My Commission expires
3/6/02

REQUEST FOR RECONVEYANCE

To Trustee
    The undersigned is the holder of the note or notes secured by this Deed of Trust  Said note or notes,
together with all other indebtedness secured by this Deed of Trust, have been paid in full  You are hereby
directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey,
without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally
entitled thereto

Date                        _____

Unofficial Copy

197502-D   **Form 3048** 9/90
GREATLAND ■
To Order Call  1 800-530 9393☐Fax 616 791 1131

2000 092 8001205

# MORTGAGE INSURANCE RIDER

This Mortgage Insurance Rider is made this      26th     day of **September 2000**                         , and is incorporated into and shall be deemed to amend and supplement the mortgage, deed of trust or security deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's      **FIXED RATE**
[identify type of note, *e g* fixed rate] note (the "Note") to **HOMESTREET BANK**

("Lender") of the same date and covering the property described in the Security Instrument and located at

　　　　　1001 NW 175TH STREET, SHORELINE, WA  98177
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　[Property Address]

The Security Instrument is amended by adding the following at the end of Section 10 (if the Security Instrument has a form date at the lower right corner of 3/99 or later) or Section 8 (if the Security Instrument has a form date at the lower right corner that is earlier than 3/99)

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed  Borrower is not a party to the Mortgage Insurance

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums)

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance " Further

(A)  **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(B)  **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain**

**Multistate Mortgage Insurance Rider-**Single Family-**Fannie Mae Uniform Instrument**　　　　　　　**Form 3160 4/00**

ITEM 9588L1 (0005)　　　　　　　　　　*(Page 1 of 2 pages)*　　　　　　GREATLAND ■
　　　　　　　　　　　　　　　　　　　　　　　　　　　To Order Call  1 800 530 9393☐Fax 616-791 1131
MFCD2023　　　　　　　　　　　　　　　　　　　　　　　　　　　197502-D

2000 092 8001205

cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

By signing below, Borrower accepts pages 1 and 2 of this Mortgage Insurance Rider and agrees that it amends and supplements the Security Instrument

_____ (Seal)
MARTA D LYALL          -Borrower

_____ (Seal)
JOSHUA E WEST          -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

2000 092 8001205

Unofficial Copy

Form 3160 4/00

ITEM 9588L2 (0005)
MFCD2023

(Page 2 of 2 pages)

GREATLAND ■
To Order Call 1-800-530-9393 □ Fax 616-791-1131
197502-D

# EXHIBIT i

Thank you,

Marisa Bender
Attorney
Weinstein & Riley, P.S.
2001 Western Avenue Suite 400
Seattle, WA 98121
Direct: 206-673-8413 Fax: 206-269-3493

The foreclosure mediation matters that were being handled by Bishop, Marshall & Weibel (now Marshall & Weibel), are now being handled by the firm of Weinstein & Riley.  Much of the personnel that handled these cases has remained the same between both firms, however our contact information has changed.  Please direct any emails regarding this foreclosure mediation to FCLmediationNW@w-legal.com.

All-
1.
Truman 2013 SC3, LLC, a New York Corporation does not exist. Please see the attached screen shot of the corporation search from NY state, secretary of state's web site. You can go there yourself and do a search.

2.
The instrument filed on 9/23/2015, and signed on 5/24/2014, by Bank of America, was the first instrument filed, where Bank of America assigned all their beneficial rights to TRUMAN 2013 SC3 TITLE TRUST, whose address is: TRUMAN 2013 SC3, LLC, 200 BUSINESS PARK DRIVE SUITE 103, ARMONK, NY, 10504.

This transfer of interest is past the date stated in the declaration provided here, making that 2014 declaration moot.

3.

ex-1-mediation.pdf

Found in em-me@nfold.net Zoho Inbox

**New contact info found**
Marisa Bender  add…

From: **Marisa Bender** ›

Correct LYALL Beny Dec                                    Hide

To: Marta Lyall ›  Virginia Davis ›

Cc: DRC of King County ›  Brigid.Henderson@commerce.wa.gov ›

November 6, 2015 at 12:13 PM

I am getting further clarification on how to identify the *owner*, at least as it would be on a Notice of Default if this loan had not been transferred.  I will provide an update as soon as I have a firm response from the beneficiary.

Thank you,

Marisa Bender
Attorney
Weinstein & Riley, P.S.
2001 Western Avenue Suite 400
Seattle, WA 98121
Direct: 206-673-8413 Fax: 206-269-3493

**The foreclosure mediation matters that were being handled by Bishop, Marshall & Weibel (now Marshall & Weibel), are now being handled by the firm of Weinstein & Riley.  Much of the personnel that handled these cases has remained the same between both firms, however our contact information has changed.  Please direct any emails regarding this foreclosure mediation to FCLmediationNW@w-legal.com.**

Page 11

**8.**

a. The name and address of the owner of the note or other obligation secured by the above deed of trust are as follows:

Name: <u>Bank of America, N.A.</u>
Address: <u>475 Crosspoint Pkwy</u>
<u>Getzville, NY  14068-9000</u>

**NOTE: Above Text states Bank of America is the owner of the Note, This was incorrect. This is on a Notice of Default, sent to the Plaintiff in 2013, see date below.**

b. The name, address and telephone number of the party acting as a servicer of the obligation secured by the above deed of trust are as follows:

Name: <u>Bank of America</u>
Address: <u>475 Crosspoint Pkwy</u>
<u>Getzville, NY  14068-9000</u>
Phone: <u>1-800-846-2222</u>

DATED:  April 17, 2013

_____
Agent for Deed of Trust Beneficiary
Bishop, White, Marshall & Weibel, P.S.
720 Olive Way, Suite 1201
Seattle, WA 98101
(206) 622-7527

Lyall, Marta D., 485.1325611

This Notice of Default was mailed on: April 17, 2013

January 30, 2014

751

MARTA OCHANDARENA
1001 NW 175TH ST
SHORELINE, WA 98177-3809

**NOTE:Bank of America sent the Plaintiff a Notice that her SERVICER would be Rushmore Loan Servicing, (The Defendant).**
**On January 30, 2014, Rushmore WAS the Servicer, amd still is. Yet they claim they have no relationship with Bank of America, but BoA is the only party who hired them as Servicer. BoA claimed to be the Note Holder, in 2013. They were not. Rushmore has no rights**
**To change the beneficiary, or claim to have rights to foreclose for a party named Truman Holdings LLC.**

**Your New Loan Number:**        7600025946
Property Address:                1001 NW 175TH ST
                                 SHORELINE, WA 98177

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING

Dear Mortgagor(s):

You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, has been assigned, sold or transferred from Bank of America to Rushmore Loan Management Services LLC (Rushmore), effective 1/21/2014. The transfer of the servicing of your mortgage does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your previous servicer send you this notice at least 15 days before the effective date of transfer. As your new servicer, we must also send you this notice no later than 15 days after this effective date or at closing.

Your previous servicer was Bank of America. If you have any questions regarding the transfer of servicing from your previous servicer, call Bank of America Customer Service at 1-800-669-6607 between Monday-Friday 7a.m. to 7p.m.. This is a toll free number.

Rushmore will be your new servicer. The business addresses for your new servicer are as follows:

Correspondence Address
Rushmore Loan Management Services, LLC
15480 Laguna Canyon Road, Suite 100
Irvine, CA 92618

Payment Address
Rushmore Loan Management Services, LLC
P.O. Box 514707
Los Angeles, CA 90051-4707

The toll free number for your new servicer Rushmore is (888) 504-6700. If you have any questions related

**Done**    BAC-US-Bank-Truman-EX-M.pdf     



**Electronically Recorded**
**20150923001238**
SIMPLIFILE          ADT          15.00
Page 001 of 002
09/23/2015 04:00
King County, WA

*This is a recorded document presented to Rushmore's Attorney, during Mediation. It assigns Title from MERS.MERS can not transfer Title, it is not a beneficiary or note holder.It states the beneficiary is the non-existing Truman 2013 SC3, Title Trust. This is what Bank of America Inherited, when they took over the Plaintiff's Mortgage in January, 2008.*

When recorded mail to:
**Rashmore Loan Management Services LLC**
**Attn: Ezra Leyton**
**15480 Laguna Canyon Drive, Ste 100**
**Irvine, CA 92618**

DocID# 73118033491013811

Tax ID:        358650-0675-09

Property Address:
**1001 NW 175th St**
**Shoreline, WA 98177-3809**

Recording Requested By:
**Bank of America**
Prepared By:
**Julia Cortez**
800-444-4302
101 S. Marengo Ave.
Pasadena, CA 91101

**ASSIGNMENT OF DEED OF TRUST**

For Value Received, **BANK OF AMERICA, N.A.** whose address is **1800 TAPO CANYON ROAD, SIMI VALLEY, CA 93063** does hereby grant, sell, assign, transfer and convey unto **US BANK NA AS LEGAL TITLE TRUSTEE FOR TRUMAN 2013 SC3 TITLE TRUST** whose address is **TRUMAN 2013 SC3, LLC, 200 BUSINESS PARK DRIVE SUITE 103, ARMONK, NY 10504** all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

Beneficiary:        **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR COUNTRYWIDE BANK, FSB., ITS SUCCESSORS AND ASSIGNS**
Made By:          **MARTA D LYALL**
Original Trustee:    **LS TITLE OF WASHINGTON**
Date of Deed of Trust:  **1/2/2008**
Original Loan Amount:  **$427,500.00**

Recorded in King County, WA on: 1/8/2008, book N/A, page N/A and instrument number 20080108000492

Property Legal Description:
**THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF KING, CITY OF SHORELINE, STATE OF WASHINGTON, AND IS DESCRIBED AS FOLLOWS: LOT 27, BLOCK 29, INNIS ARDEN NO. 3, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 46 OF PLATS, PAGES 42 THROUGH 45, INCLUSIVE, RECORDS OF KING COUNTY, WASHINGTON. SITUATE IN THE COUNTY OF KING, STATE OF WASHINGTON ABBREVIATED LEGAL  LOT 27, BLOCK 29, INNIS ARDEN NO. 3  TAX ACCOUNT NO. 358650-0675-09**

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on

MAR 24 2014

**BANK OF AMERICA, N.A.**

By: _____
Luis Roldan

Note: In 2013, 2014, 2015, 18, 19, 2022, Rushmore Loan Servicing presented multiple false documents, with different beneficiaries. In October 2015, they stated Truman 2013 SC3 Title Trust was listed by them as Beneficiary. it was listed as a NY LLC. As you can see it was not, This was presented duringthe Plaintiff's attempt for mediation. Their own Lawyer, Marisa Bender, would not name the Beneficiary. See email from her, written to Attorneys and the Plaintiff, and copied to the Plaintiff, during the mediation process. Please note that mediation on Washington state is funded by Bank of America. So there is a conflict of interest.



## NYS Department of State
### Division of Corporations
### Informational Message

**The information contained in this database is current through November 5, 2015.**



No business entities were found for Truman 2013 SC3 Title Trust.

Please refine your search criteria.

To continue please do the following:

Tab to Ok and press the Enter key or Click Ok.

Ok

Services/Programs | Privacy Policy | Accessibility Policy | Disclaimer | Return to DOS Homepage | Contact Us





**Date:** November 4, 2015 at 6:05:36 PM PST
**To:** Virginia Davis <giniannd@gmail.com>
**Cc:** Sharon Moon <sharonm@kcdrc.org>, Commerce <Brigid.Henderson@commerce.wa.gov>
**Subject:** Re: Correct LYALL Beny Dec

All-
As I mentioned earlier, and in the adversary complaint,there is no legal entity named Truman title Trust 2013 SC3 at the address listed on the assignment filed on September 23, 2015. In a letter from Rushmore, dated September 2015, it states Bank of America is the beneficiary. Truman title trust 2013 sc3 doe not exist in the NY Secretary of State corporations, yet on the assignment document, it states it is a NY trust. In addition, NY laws governing NY Trusts, do not allow default notes to be entered into them. So my note could not legally be owned by this Trust. In addition, there is no title trust in NY with this name.

Because of these issues, I am requesting a Beneficiary declaration dated this month, which states the legal beneficiary. I can provide documents which show this trust is not the legal beneficiary. I find it interesting is came from Rushmore, out of the blue, yet I was never shown it before, and I was told in a recent letter from Rushmore that Bank of America is the beneficiary. I was also told this in September, 2015, by the foreclosure trustee at Weinstein and Riley.

Note:This is an email sent during Mediation to all parties, requesting a Defined statement of Note Holder, Benificary of her Mortgage, being mediated. These are mediation parties who are supposed to be neutral. Rushmore'sOwn Attorney, Marisa Bender, refused to name the beneficiary.Without a defined beneficiary, the mediation would not be binding.

On or about November 16, 2015, the mediator, Gini Ann Davis, insisted that the Plaintiff enter into the mediation without a confirmed beneficiary. The beneficary had been named bank of America, as stated by Mack Murry, at the Urban League, who was to represent the Plaintiff. Marisa Bender, who worked for the Foreclosure Trustee, and for Rushmore Loan Management, according to her own statements, (although this is against Washington State law), did not know who the beneficiary was, even though she was willing to enter into a mediation with the Plaintiff, naming the beneficiary Bank of America, which was clearly incorrect.

# EXHIBIT J

**Date:** November 4, 2015 at 6:05:36 PM PST

**To:** Virginia Davis <giniannd@gmail.com>

**Cc:** Sharon Moon <sharonm@kcdrc.org>, Commerce <Brigid.Henderson@commerce.wa.gov>

**Subject:** Re: Correct LYALL Beny Dec

All-

As I mentioned earlier, and in the adversary complaint, there is no legal entity named Truman title Trust 2013 SC3 at the address listed on the assignment filed on September 23, 2015. In a letter from Rushmore, dated September 2015, it states Bank of America is the beneficiary. Truman title trust 2013 sc3 doe not exist in the NY Secretary of State corporations, yet on the assignment document, it states it is a NY trust. In addition, NY laws governing NY Trusts, do not allow default notes to be entered into them. So my note could not legally be owned by this Trust. In addition, there is no title trust in NY with this name.

Because of these issues, I am requesting a Beneficiary declaration dated this month, which states the legal beneficiary. I can provide documents which show this trust is not the legal beneficiary. I find it interesting is came from Rushmore, out of the blue, yet I was never shown it before, and I was told in a recent letter from Rushmore that Bank of America is the beneficiary. I was also told this in September, 2015, by the foreclosure trustee at Weinstein and Riley.

Note:This is an email sent during Mediation to all parties, requesting a Defined statement of Note Holder, Benificary of her Mortgage, being mediated. These are mediation parties who are supposed to be neutral. Rushmore'sOwn Attorney, Marisa Bender, refused to name the beneficiary.Without a defined beneficiary, the mediation would not be binding.

On or about November 16, 2015, the mediator, Gini Ann Davis, insisted that the Plaintiff enter into the mediation without a confirmed beneficiary. The beneficary had been named bank of America, as stated by Mack Murry, at the Urban League, who was to represent the Plaintiff. Marisa Bender, who worked for the Foreclosure Trustee, and for Rushmore Loan Management, according to her own statements, (although this is against Washington State law), did not know who the beneficiary was, even though she was willing to enter into a mediation with the Plaintiff, naming the beneficiary Bank of America, which was clearly incorrect.

Page 2

# EXHIBIT K

As Stated in the complaint, the Washington Statute, RCW 4.16.0.40, which the Plaintiff points to in her claim, states the mortgage she signed in January 2008, with Countrywide, is no longer valid, as the statute of limitations has lapsed. The mortgage is only valid, for six years after the last payment was made, which was April 1, 2012. It has now been over ten years.  Rushmore's Client, Bank of America, or anyone else they claim erroneously is their client, can not seek to foreclose, and has no claim on the Plaintiff's property.

Recently, the Defendant has tried to point to RCW 4.16.020 as a statute which provides exceptions to the six years, allowing ten years, prior to the statute of limitations running out. But they misread this statute, intentionally. The statute counts backwards, from the date of an action filed to claim the property. And is only applicable if the party making the claim to the Property: Rushmore et al, is in possession of the property, which they are not. The Plaintiff lives in the property. And the property is an asset in LYL Trust, a revocable Trust, which operates in Situs, under Montana Law.

In addition, there has been no valid assignment of the Plaintiff's Homestreet mortgage of 2000, because MERS had no legal right to transfer it, as they were not the note holder, or beneficiary.

Multiple banks, including Countrywide and Bank of America have fraudulently attempted to fool courts, and the Plaintiff, into agreeing to fraudulent Mortgage agreements, in order to be paid in full, multiple times, by REIT investors. They have been paid in full. And Bank of America, and their Servicer, the defendant Rushmore Loan Servicing have even named multiple entities as Beneficiaries when they had no authority to do so. And Rushmore Loan Servicing has misrepresented themselves to multiple courts, as not being associated with Bank of America, who since 2012, has aligned themselves with horrific acts to intimidate and threaten the Plaintiff, for ten years, because of what she witnessed at Carnegie Mellon University. The record shows they are not separated.

Truman Holdings LLC, named on the most recent notice of default, (received by the Plaintiff via certified Mail on June 17, 2022, has no claim to the Plaintiff's Property. In a recent letter by Plaintiff Rushmore, they absurdly claimed that Truman Holdings was a Servicer… Rushmore continues it absurd, false statements.